| | | | |
|---|---|---|---|
| **PAMELA MARIE DESOTO,** | ) | | |
| | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | **Case No. 3:14-cv-0822** | |
| **v.** | ) | **Judge Aleta A. Trauger** | |
| | ) | | |
| **BOARD OF PARKS AND RECREATION,** *et al*, | ) | | |
| | ) | | |
| **Defendants,** | ) | | |

## MEMORANDUM

Pending before the court are several motions related to the plaintiff's Amended Complaint, including separate motions to dismiss under Rule 12(b)(6) filed by defendants Tommy Lynch (Docket No. 13), Metropolitan Government of Nashville & Davidson County ("Metro Nashville") (Docket No. 16), the Board of Parks & Recreation (Docket No. 18), Kevin Hooper, Bryan Irvin, and Jerry Moore (Docket No. 20), Chris Taylor (Docket No. 24), and Danny Duke (Docket No. 30), as well as four Motions to Stay Discovery filed by particular defendants (Docket No. 38, 41, 42, and 44). For the reasons stated herein, certain claims will be dismissed with prejudice, certain claims will be dismissed without prejudice, the plaintiff will be granted leave to file an amended pleading, and discovery will be stayed pending further order of the court.

## BACKGROUND

### I. Overview and Amended Complaint Allegations

The plaintiff, Pamela Marie DeSoto, is an employee of the Parks & Recreation Department ("Parks & Recreation"), a branch of Metro Nashville. The Board of Parks and

1

Recreation (the "Board") supervises, controls, and operates Parks & Recreation. Until 2013, DeSoto worked as a sergeant with the Parks Police, which is a division of Parks & Recreation. In 2013, DeSoto was de-commissioned and was essentially demoted to a non-police position. DeSoto is female, Hispanic, 55 years old, and is in a same-sex relationship.

Although DeSoto inappropriately attempts to introduce various facts outside the record in her *omnibus* Response to the motions to dismiss, the court will focus on the well-pleaded allegations in her Amended Complaint. DeSoto alleges that she was hired by Parks Police in 1982 as one of the division's first females and as its first Hispanic officer. She rose to the rank of sergeant, becoming the division's highest ranking female officer, and had an impeccable work record during the course of her employment.

DeSoto generally alleges that, after being hired, she "has been forced to endure repeated acts of discrimination and a hostile work environment." (Am. Compl. ¶ 12.) She alleges that, "[i]n the past, attempts have been made by her supervisors to prevent [her] from obtaining promotions and pay raises for which she was more qualified than her peers." (*Id.*) She does not provide any details concerning these general allegations, such as when they allegedly occurred, what positions they related to, and what type of "discrimination" (race, age, sex, or sexual orientation) they allegedly reflected. Whatever the nature and timing of these incidents may have been, she alleges that they led her to file a "charge of discrimination" with the Equal Employment Opportunity Commission ("EEOC") in 2002. (*Id.*) Aside from the fact that she filed an EEOC charge, DeSoto does not allege any specifics concerning the charge or how it was resolved.

DeSoto alleges that, after she filed the charge in 2002, things "improved slightly" but she "continued to be discriminated against in a variety of ways." (*Id.* ¶13.) DeSoto provides only

one purported example of this alleged discrimination: after she successfully lobbied to have a female restroom built at Parks Police headquarters, male officers began using the restroom as well, at which point DeSoto complained. Parks Police changed both the male and female bathrooms to "unisex" bathrooms at an unspecified time. DeSoto claims that this change of bathroom designation reflected a "retaliatory action[]" by Parks Police designed to show female officers that they were "not welcome at Parks Police."[1] (*Id.* ¶ 13.) DeSoto also alleges that "Metro's agents regularly harassed and intimidated [her] in the past through the use of degrading items, such as condoms." (¶ 24.) DeSoto does not provide any specifics, such as whether the conduct occurred before or after her 2002 EEOC charge, who allegedly engaged in it, whether she reported it to anyone, or whether anyone addressed it.

The gravamen of DeSoto's claims relates to her interest in a promotion in 2013. In early 2013, a lieutenant's position at the Parks Police became available. DeSoto communicated to her supervisor (Captain Chris Taylor) and unspecified other people that she intended to apply for the lieutenant's position. DeSoto had received an "outstanding" performance review in December 2012 and believed that she was qualified for the position. DeSoto also believed that her colleague, Sergeant Bryan Irvin, was a "rival" for the position who "was being groomed" for promotion by the Parks Police. (*Id.* ¶ 23.) She alleges that Sergeant Irvin is younger than she, although she does not specify whether Sergeant Irvin is over or under the age of 40.

Applications for the open lieutenant position were scheduled to be accepted in July 2013. However, in May 6, 2013 (*i.e.*, approximately two months before applications would be

---

[1] As explained herein, the court fails to understand how the designation of unisex bathrooms was indicative of sex discrimination.

accepted), Captain Taylor "de-commissioned" DeSoto without warning,[2] based on the results of (in the Amended Complaint's words) a "purported investigation" that "had apparently begun months earlier."[3]  (*Id.* ¶ 15.)  The de-commissioning effectively precluded DeSoto from being a viable candidate for the open lieutenant's position.  Although DeSoto does not allege that anyone else participated in Captain Taylor's initial decision to de-commission her, she alleges that the de-commissioning was the result of ongoing discrimination by the "Parks Police" against her, based on her sexual orientation, gender, race, and age.

The Amended Complaint is somewhat vague concerning the chronology of events that followed.  On the date on which Sergeant Taylor de-commissioned her (May 6, 2013), DeSoto was forced to surrender her firearm and other equipment.[4]  DeSoto alleges that Captain Taylor, who was armed, ordered DeSoto to enter the back of a "police car" in which Sergeant Irvin and her former subordinate officer, Officer Jerry Moore, were seated.  Sergeant Irvin and Officer Moore were armed at the time, whereas Officer DeSoto was not.[5]  DeSoto alleges that Captain

---

[2] Although it is not contained within the Amended Complaint, the record contains testimony from Captain Taylor explaining that de-commissioning a Parks Police employee involves removing and retrieving the employee's indicia of police authority, including her badge and firearm(s), among other items.

[3] Although the Amended Complaint does not state it explicitly, other materials in the record indicate that Captain Taylor conducted an investigation into alleged misconduct by DeSoto, purportedly in response to complaints from multiple of DeSoto's colleagues.

[4] Although not stated clearly in the Amended Complaint, a transcript of the conversation between DeSoto and Taylor on May 6, 2013 (which Taylor apparently recorded), reflects that Taylor began the process of retrieving her indicia of police authority at the end of their conversation.

[5] DeSoto does not allege that it was out of the ordinary for Parks Police officers to be armed.

Taylor ordered her into the car "ostensibly to retrieve additional equipment."[6] (*Id.* ¶ 16.)  In a later section of the Amended Complaint, she alleges that she repeatedly pleaded with Captain Taylor not to force her into the police car.  (*Id.* ¶ 51.)  The Amended Complaint is somewhat vague about what happened next.  In ¶¶ 16 and 50, she alleges that she "was eventually allowed to leave the Parks Police premises with her sister and brother and brother-in-law, neither of whom was armed," but she complains that "they were closely followed by Parks Police and ordered to travel directly to Sgt. DeSoto's residence."  In ¶ 51, she alleges that Captain Taylor, Sergeant Irvin, and Officer Jerry Moore "compelled [her] to enter the police car and travel to her personal residence."  The only plausible inference from these allegations is that DeSoto was initially ordered to enter the car, refused to do so, and ultimately was permitted to travel to her residence (or to leave the premises) separately.[7]

On June 25, 2013, Director of Parks and Recreation Tommy Lynch sent DeSoto a letter alleging that she had violated four of Metro's Civil Service Rules, including deficient or inefficient performance of duties, insubordination toward a supervisor, violation of the

---

[6] Again, materials outside the Amended Complaint provide some much-needed context for this allegation: DeSoto apparently maintained her residence on Parks & Recreation property, where she may have kept additional work-related firearms.

[7] In DeSoto's Response, DeSoto's counsel attempts to provide additional context for these allegations by introducing facts outside the record.  In the Response, counsel represents that Taylor, Irvin, and Moore used "force or the threat of force to make her enter the police car," but that, "[a]t the last moment, . . . Sgt. DeSoto was rescued by her sister and brother-in-law and ultimately allowed to leave Parks Police headquarters with them, although they were closely followed by Sgt. Irvin and Officer Moore."  (Response at p. 81.)  Even considering these statements, they only reinforce that, by DeSoto's own admission, she did not actually enter the police car despite Captain Taylor's initial orders.

department's written rules, policies, or procedures, and dishonesty.[8]  According to DeSoto,

Captain Taylor and Director Lynch both recommended that DeSoto be terminated for those

purported violations.

Following her initial de-commissioning, DeSoto requested an internal Department

Hearing to challenge the alleged violations.  That hearing was held on June 18, 2013, and

DeSoto's current counsel appeared on behalf of DeSoto.  (*See* Docket No. 51, Ex. 4, Transcript

of Departmental Hearing.)  The hearing panel, which included Director Lynch, found that the

dishonesty violation was "inconclusive" but that the other three violations were supported.  (Am.

Compl. ¶ 17; *see also* Docket No. 49, Ex. 3, Petition for Review, at Ex. A thereto (pp. 11-12),

June 25, 2013 Letter from Director Lynch to Desoto).[9] The panel recommended that DeSoto be

---

[8] The Amended Complaint does not state the date of this letter.  However, DeSoto filed a copy of the letter as an exhibit to her Response in opposition to the various motions to stay discovery. (*See* Docket No. 49, Ex. 3, at Ex. A thereto (pp. 11-12).)

[9] Both DeSoto's Amended Complaint and the Response brief make representations about the content of this letter, thereby incorporating it by reference.  With respect to the dishonesty charge, the letter states that the Panel concluded as follows: "It was determined that violation #13 [the charge of "Dishonesty], was inconclusive."  With respect to the remaining three charges, the letter states that "[t]he Departmental Hearing has recommended a 20 day suspension and a permanent demotion to Park Police Officer 2."  In the letter, Director Lynch states that he "concur[s] with the recommendations of the panel[.]"  The court believes this discussion of the content of the letter is necessary in light of arguably exaggerated statements by plaintiff's counsel about the actual content of this letter and the necessary inferences to draw from it.  (*See* Response at p. 8 ("During the Department Hearing, Sgt. DeSoto established that two portions of the statements at issue made by Officers Foster Hite and Tom Harbison were false when the hearing panel reversed Parks Police's initial charge that DeSoto had engaged in dishonesty based on these statements."); p. 38 n.8 (same); and p. 49 ("Ultimately, the Panel reversed the 'Dishonesty' charge based on the incident with Officer Foster Hite and reversed the recommendation that Sgt. Desoto be terminated.")  The letter in fact contains no findings as to why the panel found the dishonesty violation to be "inconclusive."  Furthermore, the letter does not contain an affirmative finding that DeSoto was exonerated of dishonesty – as DeSoto's

suspended for 20 days (rather than terminated) and that she be demoted from the rank of sergeant to the rank of "officer," with a commensurate reduction in salary.

Soon thereafter, DeSoto appealed the panel's decision to the Civil Service Commission ("CSC"), which apparently has been overseeing proceedings related to DeSoto's appeal since that time (hereinafter, the "CSC Appeal"). According to the Amended Complaint, Parks Police-related employees subsequently destroyed records of DeSoto's that were relevant to her appeal. First, at some point during the pendency of DeSoto's appeal to the CSC, Captain Taylor and Officer Kevin Hooper "cleaned out" DeSoto's office and "purged" it of her personal documents, which DeSoto alleges contained unspecified evidence of "discrimination" against her by the Parks Police. During a deposition in the CSC Appeal, Taylor testified that he removed the records unilaterally (without notice to DeSoto or her counsel) because DeSoto was "never coming back to Parks Police as a supervisor" – notwithstanding the pending appeal of her de-commissioning. In another deposition in the CSC Appeal, Officer Hooper admitted that, without notice to DeSoto or her counsel, he had taken personal manuals and other property belonging to DeSoto from her patrol car to his private residence.[10] DeSoto also claims that unspecified individuals removed "valuable and sentimental items" from her office, including a personal watch and antique badges. DeSoto alleges that "the defendants" engaged in these actions in an

_____

counsel has essentially represented to the court here – only that the panel's assessment of the charge was "inconclusive."

[10] DeSoto does not allege that Sergeant Hooper destroyed these records, that they are otherwise unavailable to her upon request, that they could not be replaced, or that they constituted or contained evidence relevant to her CSC Appeal. DeSoto does not specifically allege that Officer Hooper intended to interfere with her CSC Appeal or that he reached some type of agreement to that effect with Captain Taylor or anyone else at the Parks Police.

effort to intimidate her and to dissuade her from pursuing her discrimination complaints against the Parks Police.

In another section of the Amended Complaint that could benefit from additional contextual allegations, DeSoto alleges that a Metro Nashville employee "tampered" with her workplace BlackBerry during the course of the CSC Appeal. According to testimony from Captain Taylor quoted in the Amended Complaint, Captain Taylor confiscated the BlackBerry at the time he de-commissioned DeSoto and stored it in a safe at the Parks Police office. At some later point, a Metro Nashville Information Technology Services technician, Danny Duke, attempted to access the BlackBerry by entering pincodes.[11] Apparently, a BlackBerry wipes its own data after ten unsuccessful login attempts: Duke attempted to access the BlackBerry nine times without success and changed the "baseline password" in an unsuccessful effort to gain access. In an unspecified communication thereafter, Duke represented that he had only attempted to access the BlackBerry seven times, that Captain Taylor had provided access pincodes to Duke for that purpose, and that Director Lynch had authorized Duke to change the baseline password. At some point in the CSC Appeal, the parties ascertained that there was only one access attempt remaining before the BlackBerry's data would be wiped out, leading to a deposition in which Captain Taylor testified that Duke had lied on all fronts: Duke had made nine access attempts (not seven), Duke was never authorized to make adjustments to the "baseline password" (presumably creating some difficulty with respect to the tenth and last access attempt by the parties), and Duke had simply lied to cover up his own incompetence.

---

[11] DeSoto's Amended Complaint does not articulate why Duke might have attempted to access the phone. Records outside the Complaint indicate that, in the CSC Proceeding, DeSoto issued a hold notice to Metro Nashville relating to the BlackBerry, leading to some type of dialogue between DeSoto and Metro Nashville about preservation of information on the BlackBerry.

Although it is not clear precisely what transpired with respect to the final access attempt, the Amended Complaint alleges that "all information was later deleted from the phone." (¶ 21.) The Amended Complaint does not allege that Duke intended to destroy the data on the phone, that Duke was acting in any capacity other than in his role as a technician for Metro Nashville, or that Duke was aware of any improper conduct by Captain Taylor, Director Lynch, or anyone else relative to DeSoto when he attempted to access the BlackBerry.

At an unspecified point, DeSoto was "re-commissioned" without explanation, and she now works for Metro Nashville in a non-Parks Police position. DeSoto alleges that, during the pendency of her CSC Appeal, Director Lynch initially stated that he would hold the lieutenant's position open until her appeal was resolved. However, at an unspecified point, Parks Police promoted Sergeant Houston Taylor, who is *older* than DeSoto, to the lieutenant's position. Sergeant Taylor was a former subordinate of DeSoto's, and DeSoto claims that she was more qualified than he for the position. DeSoto alleges that the Parks Police originally intended to promote Sergeant Irvin, who is younger than DeSoto. However, DeSoto claims that, after she complained that the Parks Police had discriminated against her on the basis of age by sabotaging her opportunity for the lieutenant's position, the Parks Police promoted Sergeant Taylor (instead of Irvin) to insulate itself from liability for its earlier age discrimination against DeSoto. Aside from this sequence of events, DeSoto provides no purported examples of age discrimination.

DeSoto alleges that, after she filed her initial Complaint in this case, she discovered a large condom near where she regularly parks her vehicle, informed "the defendants" about the existence of the condom, and requested that "the defendants" cease from engaging in "such activity in the future." (*Id.* ¶ 24.)

## II.  **The Three Sets of Legal Proceedings**

The underlying incidents have spawned three sets of legal proceedings.

First, DeSoto filed her CSC Appeal, which remains pending. Based on excerpts from the CSC Appeal that the parties have filed in this case, it appears that those proceedings have been contentious, including vigorous disputes about the various alleged incidents of spoliation (which are now included in DeSoto's Amended Complaint in this case) and the proper scope of discovery. In particular, it appears that, over Metro Nashville's strenuous objections (including an unsuccessful interim appeal to Chancery Court), the ALJ in the CSC Appeal has authorized broad discovery of Metro Nashville related to DeSoto's contention that her de-commissioning was the result of various forms of discrimination (essentially the same grounds alleged here), rather than for legitimate reasons.

Second, DeSoto has filed four separate lawsuits in Tennessee state court related to the investigation that Captain Taylor purportedly conducted before de-commissioning her. As this court understands DeSoto's contentions in those cases, Captain Taylor purportedly received complaints from four of DeSoto's colleagues, each of whom signed a statement alleging misconduct by DeSoto that precipitated Captain Taylor's investigation of DeSoto. According to DeSoto, Captain Taylor in fact prepared those statements himself beforehand, the statements were materially false, and Captain Taylor had the four "complainants" sign the statements knowing that they were false. In each state court lawsuit, DeSoto has sued one of the four complainants who signed the prepared statements, claiming that, in doing so, each defendant is liable for libel and for portraying her in a "false light." To the best of this court's knowledge, those four lawsuits remain pending.

Third, on March 25, 2014, DeSoto filed the instant lawsuit, in which she alleges state and federal claims against the Board, Metro Nashville, Director Lynch, Captain Taylor, Sergeant

Irvin, Officer Moore, Officer Hooper, and ITS technician Duke.  As a matter of right, DeSoto

filed an Amended Complaint on April 23, 2014, asserting additional claims.  In an earlier stage

of this case, DeSoto declined to coordinate discovery in conjunction with her CSC Proceeding

and the four state court lawsuits.  (*See* Docket No. 47, Initial Case Management Order No. 2

(Magistrate Judge's Order) at ¶ 3.)  After the Magistrate Judge conducted the initial case

management conference and the defendants filed the Rule 12 motions and motions to stay

discovery, Judge Nixon recused himself and this case was reassigned to the undersigned judge.

(Docket No. 48.)

### III. DeSoto's Claims and the Defendants' Rule 12(b)(6) Motions

In this lawsuit, DeSoto asserts 21 causes of action, most of which are simply alleged

against "all defendants" without specification.  She brings the following claims: (1) First

Amendment violations (actionable under § 1983) premised on her rights to freedom of speech

and freedom of association, which she says were abridged because she "was prohibited from

openly discussing her sexuality and associating with other homosexuals, including her same sex

partner"; (2) parallel violations of the freedom of speech and freedom of assembly protections in

the Tennessee Constitution, Art. I, §§ 19 and 23; (3) violations of her fundamental right to

privacy (actionable under § 1983) under the Due Process Clause of the United States

Constitution; (4) parallel violations of her right to privacy under the Tennessee Constitution; (5)

violations of her Fourteenth Amendment right to equal protection (actionable under § 1983),

premised on discrimination on the basis of sexual orientation, gender, race, and age; (6) race,

sex, and age discrimination under the Tennessee Human Rights Act ("THRA"), §§ 41-21-100 *et*

*seq*; (7) race and sex discrimination under Title VII of the Civil Rights Act of 1964; (8) age

discrimination under the ADEA; (9) sexual orientation discrimination under Chapter 11.20.130

of the Metro Code of Ordinances; (10) retaliation under the THRA, Title VII, and ADEA; (11) individual liability under the THRA, § 4-21-301(2), for "aiding and abetting" discriminatory practices [asserted against Sergeant Hooper, Director Lynch, and Mr. Duke] ; (12) "constructive discharge" (as a freestanding claim); (13) "constructive discharge" under § 1983; (14) conspiracy to deprive DeSoto of her constitutional rights under the First Amendment, the Fourth Amendment, the Fourteenth Amendment, and the Tennessee Constitution; (15) false imprisonment; (16) violation of the Fourth Amendment right to be free from unreasonable searches and seizures; (17) violation of her right under the Tennessee Constitution to be free from unreasonable searches and seizures; (18) intentional infliction of emotional distress; (19) negligent infliction of emotional distress; (20) violation of the Computer Fraud and Abuse Act of 1986, 18 U.S.C. §§ 1030 *et seq.*; and (21) violation of the Tennessee Personal and Commercial Computer Act of 2003, Tenn. Code Ann. § 39-14-604(a).

Each defendant has moved to dismiss the claims in whole or in part for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[12]  In response to the Rule 12(b)(6) motions, the plaintiff has filed an *omnibus* Response (Docket No. 77, Ex. 1), which spans 111 pages and attaches numerous materials outside the Amended Complaint, including, among other things, (1) transcripts from hearings, interviews, and depositions related to the CSC Appeal, (2) the

_____

[12] Metro Nashville and Captain Taylor have moved to dismiss the claims against them only in part, whereas the remaining defendants have moved to dismiss all claims against them.  It appears that Captain Taylor has moved for dismissal of all claims against him other than DeSoto's claims for false imprisonment (under Tennessee common law) and violation of her right to be free from unreasonable searches and seizures.  Metro Nashville has moved for dismissal of (1) all federal claims other than the Title VII claims and (2) all state law claims other than the false imprisonment claim.  Given the multitude of claims asserted in this lawsuit, Metro Nashville and Captain Taylor could have assisted the court by identifying the specific claims that they are *not* challenging here.

Affidavit of Robert Weaver (relating to litigation costs incurred relative to the BlackBerry in the CSC Appeal), and (3) other evidentiary materials. In violation of basic Rule 12 practice, DeSoto's counsel references and relies upon these extra materials in an effort to defeat the pending motions. Although some of these materials provide context for the allegations, the court's inquiry is generally restricted to the well-pleaded allegations in the Amended Complaint. Subject to specific exceptions noted herein, the court has generally ignored these materials in deciding the instant motion.

The defendants have filed Replies to DeSoto's Response. (Docket Nos. 60-65.)

## IV. **Motions to Stay Discovery**

The defendants have filed several Motions to Stay Discovery. (Docket Nos. 40, 41, 42, and 44.) Collectively, the defendants seek a stay of discovery until the pending Rule 12(b)(6) motions, some of which raise the defense of qualified immunity (as to the individual defendants), are resolved.[13] DeSoto filed a Response to these motions (Docket No. 49), the defendants jointly filed a Reply (Docket No. 50), and DeSoto filed a Sur-Reply (Docket No. 70) with leave of court. In a June 30, 2014 Order, the Magistrate Judge temporarily stayed discovery pending resolution of the Motions to Stay. (Docket No. 47.) That interim stay remains in place.

## RULE 12(B)(6) STANDARD

---

[13] Typically, the undersigned judge does not permit discovery to take place prior to the initial case management conference, which the court generally defers conducting until challenges to the sufficiency of a plaintiff's complaint have been fully resolved. In this instance, the case was initially assigned to a different judge, who delegated case management responsibilities to the Magistrate Judge. The Magistrate Judge accordingly conducted the initial case management conference and issued two initial case management orders on June 30, 2014. (Docket Nos. 46 and 47). The case was reassigned to the undersigned judge on July 10, 2014.

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

## ANALYSIS

### I. Overview

As a general matter, the plaintiff's pleading practices in this case leave much to be desired. The Amended Complaint is short on substance and generally asserts claims against all "defendants" without specification. Furthermore, in an apparent effort to address deficiencies

14

identified by the defendants, DeSoto has introduced numerous materials outside the Amended Complaint, which are not properly considered in the court's analysis of a Rule 12(b)(6) motion. Taken together, these practices have created unnecessary work for the parties and the court.

As explained herein, the court will permit DeSoto to file an amended pleading with respect to certain claims, but that grant of leave comes with a caveat: the Second Amended Complaint should clearly specify which allegations and causes of action are being asserted against which defendant(s) and should not reassert claims dismissed with prejudice herein. Furthermore, the court will stay all discovery pending the resolution of any forthcoming Rule 12(b)(6) motions, absent a showing of need for discovery on the issue of qualified immunity before the court can rule.

## II. <u>Threshold Disposition of Certain Claims</u>

In an effort to clear the brush, the court can dispose of several classes of claims at the outset.

### A. The Board of Parks and Recreation Is Not Subject to Suit

The Board of Parks and Recreation does not have the capacity to sue or be sued. Under Fed. R. Civ. P. 17(b), the court determines the capacity of a governmental entity to be sued in federal court by reference to the law of the state in which the entity was organized: here, Tennessee. Under Metro Nashville's Charter, Metro Nashville has the capacity to sue or be sued, but the charter does not provide for the Board of Parks and Recreation to sue or be sued. *See* Charter of the Metropolitan Government of Nashville and Davidson County §§ 1.01, 11.1001, and 11.1002 (attached to Docket No. 18). DeSoto offers no substantive argument to the contrary. All claims against the Board of Parks and Recreation will therefore be dismissed with prejudice.

## B. DeSoto Was Not Constructively Discharged

As to the "constructive discharge" claims, DeSoto cites no basis for maintaining a constructive discharge claim as a freestanding claim. Even as it relates to her other claims, the alleged facts demonstrate that she was not constructively discharged. To make out a claim for constructive discharge, an employee must show that (1) the employer deliberately created intolerable working conditions, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012); *Broska v. Henderson*, 70 F. App'x 262, 266 (6th Cir. 2003). Here, DeSoto does not allege that she quit. Instead, she alleges that the Parks Police de-commissioned her against her will and that she in fact remains a Metro Nashville employee, albeit in a different capacity. Thus, the doctrine of constructive discharge is inapplicable here and the claims sounding in "constructive discharge" will be dismissed with prejudice.[14]

---

[14] DeSoto appears to misconstrue the meaning of a constructive discharge: it does not mean that an involuntary demotion was tantamount to a discharge. Instead, the doctrine simply relaxes the adverse action requirement to permit a plaintiff who voluntarily leaves a position to maintain a claim, provided that the conditions were sufficiently intolerable to drive her to relinquish the position herself. DeSoto points out that courts have relaxed the meaning of constructive discharge in certain specific contexts that involve voluntary conduct other than quitting, but those cases do not support a constructive discharge claim here. For example, in *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998), the plaintiff claimed that her employer's working environment was so hostile that it caused her to suffer a mental breakdown, which in turn forced her (albeit voluntarily, in a sense) to take an unpaid medical leave of absence from which she had no prospect of returning to work. *Id.* The Eighth Circuit found that the district court should not have charged the jury that the plaintiff could only maintain a constructive discharge by "quitting" the job: "[a] person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from intolerable working conditions, is in no better position than one who was forced to quit as a result of objectively intolerable working conditions." *Id.* at 1279. Here, DeSoto obviously did not demote herself. The de-commissioning was itself an adverse action; thus, there is no need to relax the adverse action requirement here, and the doctrine of constructive discharge plays no role.

**C. DeSoto Cannot Maintain Damages Claims Under the Tennessee Constitution**

There is no private right of action for damages under the Tennessee Constitution. *See Cline v. Rogers*, 87 F.3d 176, 179-180 (6th Cir. 1996); *Bowden Bldg. Corp. v. Tenn. Real Estate Com'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999). In the sections outlining her claims under the Tennessee Constitution, DeSoto's Amended Complaint alleges only "damages" resulting from the alleged constitutional deprivations. Those claims, which only seek damages relief, will therefore be dismissed with prejudice. The court therefore need not address whether a plaintiff may seek injunctive relief for a deprivation of rights under the Tennessee constitution, let alone whether a court may order a promotion as a specific remedy.[15]

**D. Individual Defendants Cannot Be Held Liable Under Title VII or the ADEA**

Neither Title VII nor the ADEA provide a cause of action against individuals. *Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003) (Title VII); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 n.6 (6th Cir. 1997) (ADEA). DeSoto's Title VII and ADEA claims against individual defendants (both as to discrimination and retaliation) will therefore be dismissed with prejudice. As to the Title VII claim against Metro Nashville, Metro Nashville's brief did not move for dismissal of the claim. The court therefore need not address the substance of the Title VII claim in this opinion.

---

[15] Furthermore, even if the court were to construe DeSoto's claim for relief as seeking reinstatement relative to her Tennessee constitutional claims, DeSoto has not demonstrated how reinstatement would be an appropriate remedy for the alleged violations. DeSoto alleges that her Tennessee constitutional rights to freedom of assembly, freedom of speech, right to privacy, and right to be free from unreasonable searches and seizures have been violated. The latter two alleged violations allegedly occurred *after* DeSoto's de-commissioning. The former two violations bear no reasonable relationship to her de-commissioning: as explained herein, her rights to freedom of assembly and freedom of speech are not implicated under the facts alleged. Moreover, even if her right to free speech or freedom of assembly had been infringed by the de-commissioning, she provides no authority that reinstatement would be an appropriate remedy.

**E.  Certain of the Defendants Have No Official Capacity**

Although DeSoto purports to sue each individual defendant in his personal and "official" capacities, defendants Sergeant Irvin, Officer Moore, Officer Hooper, and Mr. Duke have no official capacity in which they can be sued.  The official capacity claims against them will be dismissed.

**F.  The Alleged Facts Do Not Support § 1983 Liability Against Metro Nashville**

Metro Nashville cannot be held liable under § 1983 on a *respondeat superior* basis.  *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).  Under § 1983, a municipality can only be held liable if the plaintiff demonstrates that the alleged federal violation was a direct result of the city's official policy or custom.  *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 693) ("A municipality may not be sued under § 1983 for an injury inflicted solely by its employees or agents.") (internal quotation omitted); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 819 (6th Cir. 2007) ("The Supreme Court has long held that municipal governments may only be sued under § 1983 for unconstitutional or illegal municipal policies, and not for unconstitutional conduct of their employees."); *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014) (quoting *Slusher v. Carson*, 540 F.3d 449, 456-57 (6th Cir. 2008)).

A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of, tolerance for, or acquiescence in federal rights violations.  *Burgess*, 735 F.3d at 478.  Although it was not clear

from the Amended Complaint, DeSoto's Response appears to argue that DeSoto can maintain § 1983 claims against Metro Nashville as a "policymaker claim" (the second type) or as a supervision claim (the fourth type).

As to a policymaker claim, "municipal liability may attach for policies promulgated by the official vested with *final policymaking authority* for the municipality." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (emphasis added). "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Ramage v. Louisville/Jefferson Cnty. Metro. Gov't*, 520 F. App'x 341, 345 (6th Cir. 2013) (quoting *Pembaur v. City of Cincinatti*, 475 U.S. 469, 481-82 (1986)). Instead, "exercis[ing] discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Miller*, 408 F.3d at 814. In this analysis, "[c]onsideration should . . . be given to whether the employee . . . formulates plans for the implementation of broad goals." *Id.*

Here, in part by reference to materials outside the Amended Complaint, DeSoto contends that Director Lynch and Captain Taylor constituted officials with "final decisionmaking authority." Even considering those materials, which indicate that Captain Taylor was "expected to oversee all activities of the Metropolitan Park Police," it is obvious that neither Director Lynch nor Captain Taylor are "policymakers" for § 1983 supervisory liability purposes. First, the Amended Complaint contains no well-pleaded allegations that either Director Lynch or Captain Taylor "promulgated" a "policy" in the first place; instead, the Amended Complaint simply alleges that they discriminated against one particular employee (DeSoto) and allegedly

19

retaliated against her for complaining about it. Second, the fact that DeSoto can (and is) pursuing administrative relief to *reverse* her discipline demonstrates that Director Lynch and Captain Taylor's decision(s) are not final, are reviewable, and are subject to Metro Nashville policy constraints.

In her Response, DeSoto argues that she can also maintain a § 1983 claim against Metro Nashville based on a theory of inadequate supervision. A failure to supervise claim against a municipality can constitute an official policy or custom where the failure to supervise amounts to deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "To succeed on a failure to train or supervise claim, the plaintiff must show: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Regets*, 568 F. App'x at 394 (quoting *Ellis ex. rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). To establish deliberate indifference, a plaintiff must show prior instances of unconstitutional conduct demonstrating that the municipality has ignored a history of abuse and was clearly on notice that training or supervision was deficient and likely to cause injury. *Marcilis v. Twp of Redford*, 693 F.3d 589, 605 (6th Cir. 2012).

Here, DeSoto alleges (largely in conclusory terms) that she herself was discriminated against during her tenure at the Parks Police. She does not allege the nature of any previous forms of discrimination, how they relate to the discrimination she allegedly suffered in 2013, whether she reported these unspecified incidents of discrimination to Metro Nashville, or how the incidents (even if reported) would have placed Metro Nashville on notice of unconstitutional conduct occurring within the Parks Police (let alone widespread conduct). Although DeSoto alleges that she filed an EEOC charge in 2002, she provides no details concerning the specifics

of the charge or how it was resolved.  In substance, DeSoto's contention that she personally has

suffered multiple constitutional deprivations during her career (allegations that are conclusory to

begin with) are insufficient, standing alone, to establish supervisory liability on the part of Metro

Nashville based on a theory of inadequate supervision.

The § 1983 claims against Metro Nashville are subject to dismissal without prejudice on

these grounds alone.[16]

### G.  Metro Nashville Is Immune to DeSoto's IIED and NEID Claims

Metro Nashville has not waived sovereign immunity for IIED claims.  Also, although

DeSoto does not concede the point, Metro Nashville retains sovereign immunity from DeSoto's

NIED claims.  DeSoto's lawsuit is, in essence, a civil rights lawsuit alleging constitutional

claims for infringement of her First, Fourth, and Fourteenth Amendment rights (as well as

Tennessee equivalents) and for discrimination and retaliation related to her sex, race, age, and

sexual orientation.  Because her NEID claims arise out of essentially same the same

circumstances as her civil rights claims, Metro Nashville retains sovereign immunity against the

NEID claims under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code

Ann. § 29-20-205(2).  *See Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2011)

("[T]he plain language of the TGTLA preserves immunity for suits claiming negligent injuries

---

[16] DeSoto's claims against Metro Nashville would also fail for other reasons stated herein, such
as DeSoto's inability to articulate viable First Amendment, Due Process, and Equal Protection
claims.

arising from civil rights violations"). Therefore, the court will dismiss the IIED and NEID

claims against Metro Nashville with prejudice.[17]

### H. Aside From "Aiding and Abetting" Claims, There is No Basis for Individual Liability Under the THRA.

Under the pre-July 2014 version of the THRA, which is applicable to DeSoto's claims,

the THRA only gives rise to individual liability for "aiding and abetting" under Tenn. Code Ann.

§ 4-21-301(2). *See Thurner v. Charter Commcn's, LLC*, 2014 WL 1745445, at *3 (E.D. Tenn.

Apr. 30, 2014).[18] DeSoto's Amended Complaint contains multiple counts purporting to assert

claims against individual defendants under the THRA, but only Count 11 is asserted as a cause

of action under THRA § 301(2). Thus, other than Count 11, which the court addresses herein,

DeSoto's claims against individual defendants under the THRA will be dismissed with prejudice

without further analysis.

### I. Specific Concessions

Although it was not clear from her Amended Complaint, DeSoto concedes in her

Response that she is only pursuing CFAA and TPCCA claims against Duke, Captain Taylor, and

---

[17] As explained herein, the IIED and NEID claims also will be dismissed with prejudice for failure to state a claim. Thus, even if Metro Nashville were not immune to these claims, they would still be dismissed with prejudice.

[18] The Tennessee legislature recently enacted amendments to the THRA that became effective on July 1, 2014. Those amendments eliminated the provision for "aiding and abetting" liability, which previously was provided for in Tenn. Code Ann. § 4-21-301(2). *See* 2014 Tenn. Laws Pub. Ch. 995 (S.B. 2126), TN LEGIS 995 (2014). Desoto filed her Complaint in this case before the amended statute became effective. Therefore, the court will apply the previous version of the THRA, which contained the "aiding and abetting" provision. All subsequent references to the THRA in this opinion will refer to the pre-July 2014 version of the statute.

Director Lynch.  The CFAA and TPCCA claims against all other defendants will therefore be dismissed with prejudice based on that concession.

DeSoto concedes that she is not pursuing Mr. Duke for false imprisonment.  The court accordingly will dismiss that claim with prejudice relative to Duke.

Finally, DeSoto concedes that her individual aiding and abetting claims apply only to Duke, Captain Taylor, Office Hooper, and Director Lynch.  The court will therefore dismiss the individual THRA aiding and abetting claims against the remaining defendants with prejudice.

## III. <u>Remaining Claims</u>

### A.  General Problem of Group Pleading

In order to hold individuals liable in their individual capacities under § 1983, a plaintiff must show that each defendant was personally involved in the alleged constitutional deprivations.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  To do so, the plaintiff "must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States, (2) caused by a person acting under color of state law." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).  "Persons sued in their individual capacities under § 1983 can be held liable only on their own unconstitutional behavior."  *Id*.  Thus, the Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right."  *Lanman v. Hanson*, 529 F.3d 673, 684 (6th Cir. 2008) (emphasis in original); *see also Heyne v. Metro. Public Schs.*, 655 F.3d 556, 563 (6th Cir. 2011) ("We must analyze separately whether [the plaintiff] has stated a plausible constitutional violation by each individual

defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant.")

Here, DeSoto's Amended Complaint in general alleges claims against "the defendants," without specifying which defendants are the actual target of certain claims, what actions those defendants allegedly took related to that particular claim, and why those actions could support a given claim. DeSoto's Response brief clarifies certain claims somewhat, although DeSoto at times continues to aggregate the defendants for purposes of analysis, which is inappropriate. The court has endeavored to give DeSoto's claims a reasonable construction in this opinion, but DeSoto is advised that group pleading will not suffice in any forthcoming amended pleading.

### B. First Amendment Claims Against the Individual Defendants

DeSoto asserts First Amendment claims against all "defendants" for allegedly violating her right to freedom of speech and her right to freedom of association. The entirety of DeSoto's First Amendment claim appears to be premised on her allegation, stated in the passive voice without reference to any particular defendant, that she "was prohibited from openly discussing her sexuality and associating with other homosexuals." (Am. Compl. ¶ 26.) In her Response, DeSoto appears to contend that, because "the defendants" (again, a collective argument) allegedly refused to promote her, allegedly removed or destroyed records from her office workspace, and destroyed data on her BlackBerry, those actions amount to retaliation for exercising her First Amendment rights. In this one instance, the court will construe DeSoto's assertion of a "retaliation" claim in her Response as constructively part of the Amended Complaint. Thus, DeSoto seems to claim free speech discrimination, retaliation for engaging in protected speech, and violation of her right to associate with a same-sex partner.

Taken collectively, the defendants assert several meritorious arguments as to why DeSoto's First Amendment claims should be dismissed with prejudice. As to her free speech claims, DeSoto does not explain what speech she claims to have engaged in, how the defendants "prohibited" it, or which particular defendant or defendants prohibited her speech. The allegations do not even approach articulating a viable freedom of speech claim. Furthermore, even if there were any specific allegations (which there are not), DeSoto's individual sexuality is a personal matter that is not a "matter of public concern." *Rowland v. Mad River Local Sch. Dist.*, 730 F.2d 444, 449-51 (6th Cir. 1984). DeSoto's reliance on cases involving public employees who were retaliated against for exercising their First Amendment free speech rights by engaging in free speech outside of the workplace are inapplicable here. *See, e.g.*, *Scarborough v. Morgan Cnty. Bd. of Edu.*, 470 F.3d 250, 256 (6th Cir. 2006) (school superintendent engaged in speech on a matter of public concern, where he agreed to pray or speak before the congregation of a church comprised predominantly of gays and lesbians); *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005) (employee engaged in speech on a matter of public concern, where she filed a lawsuit alleging retaliation for assisting a fellow teacher in that teacher's separate gender discrimination claim against the school). DeSoto's claims are not cognizable as "free speech" claims.

As to DeSoto's freedom of association claim, the claim is entirely without merit. The right to "intimate association" protects an individual's right to maintain certain human relationships that "attend the creation and sustenance of a family – marriage, childbirth, the raising an education of children, and cohabitation with one's relatives." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984). DeSoto provides no well-pleaded allegations explaining what "associational" relationships have been impacted here, the nature of the interference, how and

when it occurred, or whether any particular defendant played a role in it.  Indeed, DeSoto alleges that she remains in a committed, monogamous homosexual relationship to this day.  The court is at a loss to understand how DeSoto's allegations could lead to a violation of her freedom of association.

Although DeSoto certainly has alleged serious questions about the grounds for her demotion within the Parks Police, the alleged facts cannot support claims for discrimination or retaliation on the basis of speech, nor can those facts support a claim for infringement of her "freedom of association."  The court will therefore dismiss these claims without prejudice.

### C.  Substantive Due Process/Right to Privacy Claims

DeSoto claims that her "right to privacy" has been violated, in violation of substantive due process or the Equal Protection Clause.

Non-marital romantic relationships are among the types of intimate relationships protected against intrusion by the Due Process Clause's right to privacy.  *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004).  Laws or policies that restrain intimate associations are subject either to (1) strict scrutiny, if they impose a "direct and substantial interference" with intimate association, or (2) rational basis review, if they constitute "lesser interferences."  *Id.*  DeSoto cites numerous cases regarding circumstances in which courts have protected an individual's right to intimate association or the right to keep his or her sexuality *private*, but the principles articulated in those cases bear no meaningful relationship to the circumstances presented here.  *See, e.g.*, *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) (finding that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical purpose is being served"); *Anderson v. City of LaVergne*, 371 F.3d 879 (6th Cir. 2004) (reversing trial court and

holding that police department order banning plaintiff from engaging in a sexual relationship with a co-worker survived rational basis review).

Here, DeSoto's right to privacy claims fail for numerous reasons. First, her Amended Complaint does not contain well-pleaded allegations establishing how her right to privacy was allegedly violated or when this occurred. The allegations are insufficient to state a claim and fail to show even a "lesser interference" that would merit any type of constitutional review. Second, she fails to explain how the conduct of any particular defendant violated her privacy. Third, even if the court were to construe the allegations as actually relating to the conduct of one or more of the defendants, DeSoto does not explain why being forced to keep her sexuality private at the workplace somehow violates her right to privacy: it is a right to *privacy*, after all.

Because DeSoto does not state a claim for a violation of her right to privacy on the facts alleged, the court will dismiss the right to privacy/substantive due process claims without prejudice as to all defendants other than Duke. With respect to Duke, his only alleged involvement in this case was his attempt to access DeSoto's work-issued BlackBerry well after the underlying events giving rise to her termination. Duke also works in a different department and has no conceivable connection to workplace incidents that Desoto claims reflected some form of invasion of her right to privacy. The right to privacy claim against Duke will therefore be dismissed with prejudice.

### D. Equal Protection Clause

In her Amended Complaint, DeSoto contends that "the defendants" discriminated against her on the basis of sexual orientation, gender, race, and age, in violation of the Fourteenth Amendment. DeSoto's Response focuses chiefly on her sexual orientation claims. DeSoto also relies upon and references a host of facts drawn from materials outside the Amended Complaint.

Once again, this claim relies on group pleading rather than particularized facts. DeSoto does not explain why or how any particular defendant discriminated against her on the basis of sexual orientation, gender, race, or age. Based on the alleged facts, the court finds no conceivable basis to conclude that Sergeant Irvin, Officer Moore, Officer Hooper, or Mr. Duke discriminated against her in any fashion. According to the Amended Complaint, *after* DeSoto's de-commissioning, Captain Taylor allegedly attempted to force DeSoto into a police car in which Sergeant Irvin and Officer Moore were seated. Officer Hooper allegedly cleaned out DeSoto's office following her termination. Duke allegedly attempted to access DeSoto's BlackBerry in the context of ongoing legal proceedings, well after the underlying allegedly discriminatory events. DeSoto does not allege that Irvin, Moore, Hooper, or Duke played any decision-making role in DeSoto's discipline, that they carried out their duties in a discriminatory manner, or that they were personally involved in any specific deprivation of rights (apart from allegedly discriminatory decisions already made by others, such as DeSoto's de-commissioning). In particular, the Equal Protection claim against Duke appears to be frivolous. The court will dismiss the Equal Protection claims against these defendants with prejudice.[19]

As to Captain Taylor and Director Lynch, the Amended Complaint does articulate facts showing that they played decision-making roles in DeSoto's de-commissioning. However, age and sexual orientation are not suspect classes under the Equal Protection Clause. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (age); *DeBoer v. Snyder*, --- F. 3d --- , 2014 WL 5748990, at *9-*13 (6th Cir. Nov. 6, 2014) (sexual orientation); *Heike v. Guevara*, 519 F. App'x

---

[19] The age discrimination and sexual orientation discrimination claims against these defendants are also subject to dismissal with prejudice for the independent reason stated in the next paragraph.

911, 2013 WL 1092737, at *9 (6th Cir. Mar. 18, 2013) (sexual orientation not a suspect class). The claims of a plaintiff asserting discrimination based on age or sexual orientation must typically be analyzed as a "class of one" under rational basis review. *PHN Motors, LLC v. Medina Twp.*, 498 F. App'x 540, 548 (6th Cir. 2012) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Heike*, 2013 WL 1092737, at *9.[20] Unfortunately for DeSoto, public employees cannot proceed as a "class of one," because "the class-of-one theory of equal protection does not apply in the public employment context[.]" *Enquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 607 (2008). Therefore, DeSoto's age and sexual orientation discrimination claims premised on the Equal Protection Clause must be dismissed with prejudice because she cannot proceed with those claims as a "class of one" under any set of alleged facts. *See Heike*, 519 F App'x at 921-922 (finding that, under *Enquist*, a constitutional violation premised on an individual's class of sexual orientation "ends before it begins"). [21]

As to the sex and race discrimination claims against Taylor and Lynch, DeSoto has failed to plead facts showing any type of disparate treatment relative to other employees at Parks Police. The essence of an equal protection claim is disparate treatment relative to others: thus, "[t]o state an equal protection claim, a plaintiff must adequately plead that the government [treats certain people] disparately as compared to similarly situated persons and that such disparate treatment either [sic] burdens a fundamental right, targets a suspect class, or has no rational

---

[20] DeSoto argues that the court should apply heightened scrutiny to discrimination on the basis of sexual orientation. To the extent it is relevant, the court notes that the Sixth Circuit recently reaffirmed that laws discriminating on the basis of sexual orientation are subject only to rational basis review. *See DeBoer v. Snyder*, -- F. 3d --, 2014 WL 5748990, at *9-*13 (6th Cir. Nov. 6, 2014)

[21] The Equal Protection age discrimination claim would also be subject to dismissal on essentially the same grounds as the ADEA claim.

basis." *Raymond v. O'Connor*, 526 F. App'x 526, 530 (6th Cir. 2013) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Raymond*, 526 F. App'x at 530 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). DeSoto argues that she is not obligated to plead a *prima facie* case of discrimination in compliance with the *McDonnell Douglas* burden-shifting framework, which is an evidentiary standard that applies only at the summary judgment stage. *See Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). While that is true, it does not mean that she can survive a motion to dismiss without pleading specific allegations of disparate treatment, which are essential to an equal protection claim that does involve direct allegations of discrimination. *See, e.g., Raymond*, 526 F. App'x at 530 ("The complaint's sole reference to disparate treatment is the undeveloped assertion of a different and harsher standard of scrutiny might be applied to non-residents discussed above. Without specific allegations of disparate treatment, the district court properly dismissed Raymond's equal protection claim.")

DeSoto claims that she is the only Hispanic homosexual at the Parks Police and one of only two females in the department. Thus, as Captain Taylor points out in his Reply, essentially *every* employee at the Parks Police provides a basis for comparison to DeSoto's treatment as to at least one of her salient class-based characteristics, such as sex or age. *See Dickens v. Interstate Brands Corp.*, 384 F. App'x 465, 468 (6th Cir. 2010). Nevertheless, in her Amended Complaint, DeSoto has failed to allege that Taylor or Lynch treated any male or non-Hispanic

employee differently than her or that another employee engaged in the same conduct as she but was treated more favorably.[22]

In an effort to defeat dismissal, DeSoto attempts to rely on a multitude of facts outside the Amended Complaint. In the interests of justice (and organization), the court will dismiss DeSoto's gender and race discrimination claims against Taylor and Lynch without prejudice and will permit DeSoto the opportunity to re-plead them. DeSoto is advised that, relative to these defendants, the court will not countenance another group pleading or the simple aggregation of race and sex "discrimination" claims without differentiation. Instead, DeSoto must plead specific allegations as to each defendant and the factual basis for each type of alleged discrimination. This will aid the court in determining whether a viable constitutional claim has been alleged and whether Taylor and Lynch are entitled to qualified immunity with respect to it.[23]

### E. Age Discrimination Claims Under the ADEA and THRA

The ADEA prohibits employers from discriminating against employees on the basis of age with respect to the terms and conditions of employment, including promotions. *See Jones v. Memphis Light & Gas Water Div.*, 346 F. App'x 38, 43 (6th Cir. 2009) (citing *Burzynski v. Cohen*, 264 F.3d 611, 621-22 (6th Cir. 2001)). A claim of age discrimination under the THRA is

---

[22] Indeed, parsing the Amended Complaint, DeSoto does not even allege a challenge to the factual basis for the three violations for which she was disciplined.

[23] On a related note, it is not clear to the court why the plaintiff is suing Captain Taylor and Director Lynch directly for violating her right to equal protection of the laws relative to race and sex discrimination. Effectively, the race and sex discrimination claims would appear to be subsumed by the Title VII race and sex discrimination claims against Metro Nashville. Asserting the Title VII claim only against Metro Nashville aligns with how employment discrimination claims in this court are generally pled.

analyzed under the same standard as an ADEA claim.  *See Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 15-16 (6th Cir. 2007) (citing *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001)).

Typically, to establish a circumstantial case of age discrimination based on failure to promote, a plaintiff must show that (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time the plaintiff's request for the promotion was denied.  *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232 (6th Cir. 2005) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000)).

Here, DeSoto contends that she was targeted for mistreatment based on her age and that she should be able to maintain an age discrimination claim, despite the fact that the Parks Police ultimately promoted an employee who was older than she.  DeSoto's only alleged facts in support of this proposition are that Metro Nashville was "grooming" a younger employee, Sergeant Irvin, to be her replacement and that Metro Nashville ultimately chose to promote Sergeant Taylor only because DeSoto claimed that she had been discriminated against on the basis of age.  DeSoto provides no caselaw authority showing that it would violate the ADEA for Metro Nashville to promote an older employee only after considering a younger one for the position.  The Sixth Circuit standard for failure to promote claims set forth in *White* is clear, and DeSoto cannot satisfy it, because Metro Nashville promoted an *older* employee to the position that she was seeking.

Desoto contends that she has no obligation to show that someone outside her class was promoted to the lieutenant's position, because the Sixth Circuit has indicated, in a different

context, that a plaintiff can establish discrimination by showing that "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 557, 582 (6th Cir. 1992). DeSoto is mixing apples and oranges. *Mitchell* involved a claim of wrongful termination on the basis of race; for wrongful termination claims (and perhaps other forms of adverse actions other than failure to promote), the Sixth Circuit has held that a plaintiff can show discrimination by showing that a similarly situated non-protected employee was "treated better" for "the same or similar conduct." *Id.* at 583. Thus, to use a hypothetical example, if a supervisor terminates a female employee for being 15 minutes late to work once, whereas the supervisor only gives a verbal reprimand to a similarly situated male employee who was 15 minutes late to work once, the female employee could maintain a viable sex discrimination claim. DeSoto has not shown that the Sixth Circuit has grafted this approach onto a failure to promote claim, nor has DeSoto explained why this court should do so in spite of the prevailing Sixth Circuit standard in *White*, which post-dates *Mitchell* by thirteen years. At any rate, the doctrine makes no sense in the failure to promote context. DeSoto's age discrimination claims are subject to dismissal with prejudice on this basis alone.

Even if DeSoto could maintain a claim by showing that a person under 40 was "treated better" than she before Metro Nashville promoted Sergeant Houston, DeSoto has not pleaded that Sergeant Irvin was under the age of 40. Indeed, although DeSoto has introduced evidence outside the pleadings relating to the ages of other Parks Police employees (*see* Docket No. 71, Exs. 2-4 (documents reflecting ages of Sergeant Taylor, Captain Taylor, and Officer Hooper)), both her Amended Complaint and Response are noticeably silent about Sergeant Irvin's actual age, notwithstanding the fact that the defendants specifically pointed out this deficiency in

support of their Rule 12(b)(6) motions. For this additional reason, the age discrimination claims are subject to dismissal.

Furthermore, DeSoto's allegation that Metro Nashville was "grooming" Irvin for the lieutenant's position is conclusory and does not, standing alone, give rise to a plausible inference of age discrimination. DeSoto does not explain how the "grooming" was accomplished, why it was allegedly discriminatory, or how it impacted her in any way. At any rate, DeSoto has not pleaded facts giving rise to a plausible inference that her failure to be promoted resulted from someone younger than she being treated more favorably.

For all of these reasons, DeSoto's age discrimination claims will be dismissed with prejudice.

### F. Conspiracy Claims Under § 1983

The defendants assert two arguments as to why the conspiracy claims should fail: (1) DeSoto has failed to plead allegations of a conspiracy with sufficient particularity; and (2) the intra-corporate conspiracy doctrine bars the claims.

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Id.* This pleading standard is "relatively strict." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011).

Here, DeSoto's allegations are devoid of specifics concerning an alleged conspiracy. DeSoto does not articulate who she believes formed the conspiracy, what agreement they reached, or when the agreement allegedly occurred. She does not specify which constitutional

violations the conspiracy allegedly related to, nor does she draw any distinctions between the actions related to the de-commissioning itself and the later incidents of alleged evidence spoliation. All of the conspiracy claims are subject to dismissal on these grounds alone.

With respect to Sergeant Irvin and Officer Moore, the only conceivable alleged constitutional violation relates to their presence in the patrol car after Captain Taylor de-commissioned DeSoto. As the court finds for reasons stated herein, the underlying Fourth Amendment claims will be dismissed with prejudice because DeSoto was not seized; therefore, the associated conspiracy claims relating to Irvin and Moore will also be dismissed with prejudice. Indeed, in the section of her Response brief relating to the § 1983 conspiracy claims, DeSoto does not even reference Irvin or Moore.

As to Officer Hooper, the Amended Complaint simply alleges that Hooper cleaned out DeSoto's office after she was de-commissioned, resulting in the loss of records that DeSoto claims were relevant to her appeal, and that Hooper took some manuals of hers home with him at some point after she was de-commissioned. DeSoto does not claim that Officer Hooper was a party to an agreement to violate her civil rights, she does not specifically tie his conduct to any particular civil rights violation, and she does not allege that Officer Hooper intended to injure her in any way or that he intended to assist his employer in violating her civil rights in some way. As with Irvin and Moore, DeSoto's Response concerning her conspiracy claims does not even reference Officer Hooper. The court finds no conceivable basis for the conspiracy claim against Officer Hooper and will dismiss it with prejudice.

With respect to Director Lynch, Captain Taylor, and Danny Duke, the court will permit DeSoto to re-plead her § 1983 conspiracy claims as they relate to constitutional claims that the court is not dismissing with prejudice. Although the conspiracy claims are subject to dismissal

because of their vagueness, DeSoto attempts to allege some sort of coordinated misconduct by these three defendants. Clarified allegations will assist the court in rendering a more grounded decision as to whether (a) the § 1983 conspiracy claims are viable, or (b) these defendants are entitled to qualified immunity with respect to those claims.

Because the court is permitting the plaintiff to re-plead the conspiracy claims against Lynch, Taylor, and Duke, the court will defer addressing the potential application of the intra-corporate conspiracy doctrine at this time. The application of that doctrine raises potentially difficult legal issues that the court may not ultimately need to reach and that, at any rate, require more careful analysis than the parties have given them here.[24]

---

[24] The intra-corporate conspiracy doctrine was originally developed in the antitrust context to further the purposes of the Sherman Act's anti-conspiracy provision, which aims to prevent different business enterprises from engaging in anticompetitive practices in combination. *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984). Some courts, including the Sixth Circuit, later grafted the doctrine onto § 1985 conspiracy claims, which involve conspiracies by individuals (including private citizens) to deprive individuals of their civil rights. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991). Given that § 1985 was originally passed to permit private civil rights claims against members of the Ku Klux Klan for interfering with the rights of minorities to vote (among other constitutional rights violations), some commentators have complained that utilizing the intra-corporate conspiracy doctrine to bar § 1985 conspiracies among members of an organization effectively guts the original intent of the statute and reflects a serious mistake by district and circuit courts that have made that leap. *See Rahman v. Fischer*, 2012 WL 4492010, at *13 (N.D.N.Y. Sept. 28, 2012) (listing articles). Notwithstanding that criticism, many courts, including the Sixth Circuit in a post-*Hull* unpublished case, have gone even further and have applied the doctrine to § 1983 claims, generally with little or no analysis. *See, e.g.*, *Upton v. City of Royal Oak*, 492 F. App'x 492, 493, 503 (6th Cir. May 11, 2012) (citing *Hull*); *Wright v. Bloomfield Twp.*, 2014 WL 5499278, at *15 (E.D. Mich. Oct. 30, 2014); *Pardi v. Cnty. of Wayne*, 2013 WL1011280, at *14-*15 (E.D. Mich. Mar. 14, 2013); *Mauldin v. Napolitano*, 2012 WL 2870834, at *5 (E.D. Mich. July 12, 2012). On the other hand, other courts, including at least one district court within this circuit and other circuits, have refused to extend the doctrine to § 1983 claims and, in some cases, § 1985 claims as well. *See Kinkus v. Village of Yorkville*, 476 F. Supp. 2d 829, 838-41

36

## G. Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress – also referred to in Tennessee as the tort of "outrageous conduct" – has three elements: (1) "the conduct complained of must be intentional or reckless, (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of results in "serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Medlin v. Alliance Inv. Co.*, 398 S.W.270, 274 (Tenn. 1996). Tennessee has adopted a "high threshold standard" for tortious conduct that is actionable as an IIED claim. *Bain*, 936 S.W.2d 618, 622 (1997).

---

(S.D. Ohio 2007), *rev'd on other grounds*, 289 F. App'x 86, 89 n.4 (6th Cir. 2008); *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057-58 (C.D. Cal. 2000) (discussing circuit split).

The court notes that there may be a relevant distinction between (a) applying the intra-corporate conspiracy doctrine to bar a claim that a Metro Nashville supervisor conspired with Metro Nashville itself (a moot point here, since Metro Nashville will be dismissed anyway), as opposed to (b) applying the doctrine to bar a claim that two or more Metro Nashville employees conspired *with each other* (not Metro Nashville itself) to violate an individual's civil rights. *See Kinkus*, 476 F. Supp. 2d at 841. Leaving aside whether the doctrine should ever apply to § 1983 conspiracy claims, the intra-corporate conspiracy doctrine would seem to apply more sensibly to the first scenario (*i.e.*, to bar claims of a conspiracy between an employee and his employer) than the second. Here, if the remaining defendants intend to raise this defense again as a basis for dismissal of the conspiracy claims, they should be prepared to argue why the intra-corporate conspiracy doctrine should apply to bar a claim under § 1983 that two or more employees of a single governmental entity allegedly conspired with each other, rather than with their public employer. This court is not prepared to expand the intra-corporate conspiracy doctrine to bar § 1983 conspiracy claims of that type without giving due consideration to the policy grounds for doing so.

On a final note, with respect to the "scope of employment" limitation on the application of the intra-corporate conspiracy doctrine, the court preliminarily finds the Eleventh Circuit's discussion in *Grider*, 618 F.3d 1240, 1262 n.33 (11th Cir. 2010), to be particularly persuasive as to how that limitation must be cabined. *See also Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 840 (6th Cir. 1994).

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* at 623 (quoting *Medlin*, 398 S.W.2d at 274); *accord Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). The court must apply this standard to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Bain*, 936 S.W.2d at 623. Thus, a plaintiff seeking damages for IIED must meet an exacting standard. *Arnett*, 124 S.W.3d at 540 (citing *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)). Cases in which IIED claims were viable have involved truly shocking conduct. *See, e.g., Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 140 (Tenn. Ct. App. 1975) (affirming jury verdict, where defendant had preserved the body of a premature stillborn infant in a jar of formaldehyde and displayed the jar to the mother); *Dunn v. Motor Photo, Inc.*, 828 S.W.2d 747, 751 (Tenn. Ct. App. 1991) (defendants committed "gross, inexcusable and outrageous breach of contract," where they accepted plaintiff's film for developing, told the plaintiff that her film, which included naked images of her, could not be developed, and defendants in fact developed the film and circulated the naked images to friends who desired to see a "wild picture").

In applying this standard, Tennessee courts have indicated that trial courts should be wary of permitting IIED claims to move forward in employment discrimination cases, absent exceptional allegations. *See, e.g.*, *Arnett*, 124 S.W.2d at 540 ("[D]iscriminatory conduct does

not automatically give rise to the imposition of liability for intentional infliction of emotional distress. If it did, virtually every action brought under these statutes would include an intentional infliction of emotional distress claim."); *see also Godfredson v. Hess & Clark Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) ("An employee's termination, even if based on discrimination, does not rise to the level of extreme and outrageous conduct without proof of something more. If such were not true, then every discrimination would simultaneously become a cause of action for the intentional infliction of emotional distress."). Thus, even where courts permit claims of harassment or retaliation to proceed under state and federal statutes, courts will not permit IIED claims to proceed in most employment discrimination cases; this approach applies even where a defendant or its employees engaged in highly reprehensible conduct or otherwise intended to cause the plaintiff to suffer emotional distress.[25]

Here, none of the alleged conduct by any particular actor supports a plausible claim for outrageous conduct. In her Response, DeSoto inappropriately aggregates all of the alleged adverse or retaliatory actions and claims that they justify her outrageous conduct claims against "the defendants." With respect to Sergeant Irvin, Officer Moore, Officer Hooper, and Mr. Duke,

---

[25] *See, e.g., Stacy v. MVT Servs., LLC*, 2012 WL 2281495, at *8 (M.D. Tenn. June 18, 2012) (dismissing IIED claim but permitting sexual harassment claims to proceed under Title VII, TPPA, and THRA); *Mays v. Int'l Mill Servs., Inc.*, 2006 WL 208874, at *3-*5 (W.D. Tenn. Jan. 26, 2006) ("Plaintiffs may ultimately prove that [the defendant] wrongfully discharged Randy Mays and/or that he was subjected to discrimination. However, even when the factual allegations in the plaintiffs' complaint are taken as true, those allegations fail to meet the very high standard required to establish a cause of action for outrageous conduct in Tennessee and thus fail to state a claim upon which relief may be granted."); *West v. Genuine Parts Co.*, 2011 WL 4356361, at *2 (E.D. Tenn. Sept. 16, 2011) (dismissing IIED claim associated with allegedly retaliatory termination and observing that, "[b]eing terminated from his job, even if such termination is found to be wrongful or discriminatory, does not constitute outrageous conduct for the purposes of the tort of [IIED]"); *Johnson*, 2012 WL 899325, at *8 (dismissing IIED claim and observing that the plaintiff "has provided no authority, and the court has found none, in which the Tennessee courts have recognized that an employee's termination satisfies the requisite elements for outrageous conduct").

aggregation is manifestly inappropriate and the outrageous conduct claims are, in the court's view, essentially frivolous. With respect to Director Lynch and Captain Taylor, even if the court were to aggregate the various adverse actions for purposes of analysis, the claims are without merit. Although the alleged actions may have been unreasonable or even illegal, such as de-commissioning DeSoto without cause based on a protected characteristic or destroying relevant documents without her knowledge, those actions could not reasonably be construed as "atrocious" or "utterly intolerable in a civilized community." The alleged actions do not even approach the high threshold standard to maintain an outrageous conduct claim. The court will therefore dismiss the IIED claims with prejudice.

### H.  Negligent Infliction of Emotional Distress

To maintain a claim for the negligent infliction of emotional distress, a plaintiff must show "the elements of a general negligence claim, which are duty, breach of duty, injury or loss, causation in fact, and proximate causation," and that "the defendant's conduct caused serious or severe emotional injury." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012) (citing *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004)).

Here, the Amended Complaint does not identify the requisite elements of a NEID claim relative to any particular defendant: it does not specify what duty each defendant owed DeSoto, how that duty was breached, how that breach of duty caused an injury or loss to DeSoto, or how any particular defendant caused (actually or proximately) those damages. Again, at least as to defendants Irvin, Moore, Hooper, and Duke, the claims are seemingly frivolous. As to Captain Taylor, the alleged adverse actions by Captain Taylor were alleged to be *intentional*, not negligent, which provides an additional basis to dismiss the NEID claims. *See Alexander v. Newman*, 345 F. Supp. 2d 867, 887 (W.D. Tenn. 2004). As to Director Lynch, the only well-

pleaded alleged actions are that Director Lynch recommended that DeSoto be terminated and that Lynch "perhaps" directed Mr. Duke to access DeSoto's government-issued Blackberry, which ultimately resulted in destruction of the data on the BlackBerry. Again, DeSoto does not articulate how any of these actions equate to any sort of breach of duty owed by Lynch to DeSoto, nor is any duty evident to the court.

DeSoto's Response does not address these manifest deficiencies. Particularly where DeSoto alleges only intentional (mis)conduct by particular Metro Nashville employees, there is no reasonable prospect that re-pleading the NEID claims could result in viable NEID claims in this case against Taylor, Lynch, or Duke. Accordingly, the court will dismiss the NEID claims with prejudice.

## I.  False Imprisonment

False imprisonment is "the intentional restraint or detention of another without just cause." *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994). The elements of the tort are (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Id.* at 367 (citing *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). "[S]ubmission to the mere verbal direction of another, unaccompanied by force or by threats of any character, cannot constitute a false imprisonment[.]" *Id.* (quoting 35 C.J.S. *False Imprisonment* § 11.)

Under the facts alleged, the court finds no basis for a false imprisonment claim. The facts do not support a reasonable inference that Moore or Irvin actually detained or restrained DeSoto against her will. DeSoto's main complaint is that the entire experience was humiliating and perhaps unnecessary: she argues that she could simply have retrieved the weapons herself, but suggests that Taylor may have staged the scene in an effort to embarrass her. She alleges that,

41

after she resisted Taylor's initial orders, Taylor (apparently) relented and let her proceed separately along with two of her relatives. Sergeant Irvin and Officer Moore were present in the police car and were armed. Assuming all of this to be true, the facts do not establish that Irvin or Moore restrained or detained her for purposes of a "false imprisonment" claim. Given that DeSoto does not contend that she actually entered the car (even after Irvin and Moore pointed out the deficiency in their motions), the court finds no potential grounds for asserting claims of false imprisonment against Irvin or Moore. The court will therefore dismiss the false imprisonment claims against them with prejudice.[26]

### J. Fourth Amendment

DeSoto's Fourth Amendment claims against Irvin and Moore fail for essentially the same reasons as her false imprisonment claim. The Fourth Amendment provides the right to be free from arrest without probable cause. Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). A person has been "seized" within the meaning of the Fourth Amendment when an officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied. *United States v. Jones*, 673 F.3d 497, 501 (6th Cir. 2012). A seizure can occur without physical restraint if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that she was not free to leave. *Scozzari v. McGraw*, 500 F. App'x 421, 423 (6th Cir. 2012) (citing

---

[26] Captain Taylor did not move for summary judgment on the false imprisonment claim. The court therefore expresses no opinion concerning the sufficiency of the false imprisonment claim as it relates to Taylor. In the Amended Complaint, DeSoto therefore may re-assert the false imprisonment claim against Captain Taylor.

*Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)).  In order to be seized, a person must yield to a showing of authority.  *Scozzari*, 500 F. App'x at 423 (citing *Brendlin*, 551 U.S. at 254) ("[T]here is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.")

With respect to Irvin and Moore, the Amended Complaint is devoid of any well-pleaded allegations that Irvin and Moore "arrested" DeSoto.  DeSoto does not allege that she was actually detained in the patrol car, she does not allege Irvin and Moore physically threatened her or made a show of force, and she does not allege that she submitted to Captain Taylor's order in any case – indeed, she alleges that she did not submit and that she eventually was permitted to travel separately.  The court finds that she has failed to plead a Fourth Amendment violation as to Irvin and Moore.

Furthermore, even if DeSoto had alleged facts showing a "seizure" for Fourth Amendment purposes, the court would find that Sergeant Irvin and Officer Moore are entitled to qualified immunity because it was not clearly established that, by being present in a patrol car in which Captain Taylor ordered DeSoto to enter, they could be held liable for violating DeSoto's Fourth Amendment right to be free from unreasonable searches and seizures.  The court will therefore dismiss DeSoto's Fourth Amendment claims against Irvin and Moore with prejudice.

### K.  THRA Aiding and Abetting and Retaliation Claims (Against Taylor, Hooper, Lynch, and Duke)

As to the remaining THRA claims, the pre-July 2014 version of the THRA contains a provision establishing individual liability for "aiding and abetting" an "individual entity's discriminatory practices."  Tenn. Code Ann. § 4-21-301(2).  An individual can also be held liable under § 301(a) for retaliation, which is a form of discriminatory practice under the THRA.  Tenn.

Code Ann. § 4-21-102; *Beadle v. Memphis City Schs.*, 2008 WL 4982715, at *7 (W.D. Tenn. Nov. 18, 2008) (citing *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 376-77 (Tenn. Ct. App. 2005)); *Abernathy v. Tennessee Valley Recycling, LLC*, 2013 WL 1899010, *5 (M.D. Tenn. May 7, 2013).

Under the THRA, "discriminatory practices" means any "direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age, or national origin." *Id.* § 4-21-102. Accordingly, here, DeSoto's THRA aiding and abetting claims may only proceed as they relate to these protected categories. Sexual orientation is not among those categories, meaning that DeSoto cannot maintain a THRA claim premised on sexual orientation discrimination. Also, for the reasons stated in this opinion with respect to DeSoto's ADEA claim, DeSoto cannot maintain a viable age discrimination claim in the first place. *See Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 670 (6th Cir. 2006) (THRA age discrimination claims analyzed under same standard as ADEA claims). Therefore, the THRA aiding and abetting claims will, at the outset, be dismissed with prejudice except as they relate to alleged discrimination on the basis of DeSoto's sex and race.

As to the race and sex discrimination claims, to show "aiding and abetting," a plaintiff must show that "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997). Only "an individual who aids, abets, incites, compels, or commands and employer to engage in employment-related discrimination has violated the THRA." *Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999). Liability is not imposed on the individual defendant's own discriminatory acts; it requires distinct conduct

that aids or abets discrimination by the employer.  *Jenkins v. Nashville Public Radio*, 2005 WL 3358871, at *7 (M.D. Tenn. Dec. 9, 2005).[27]

To establish aiding and abetting, a plaintiff must show that a defendant "knew that his companions' conduct constituted a breach of duty, and [] gave substantial assistance or encouragement to them in their acts."  *Hajizadeh v. Vanderbilt Univ.*, 879 F. Supp. 2d 910, 929 (M.D. Tenn. 2012).  Also, a defendant cannot be held liable for aiding and abetting by acting within the course and scope of his employment.  *See Thompson v. City of Memphis*, 491 F. App'x 616, 621 (6th Cir. 2012).

There is at least one fundamental problem with DeSoto's THRA race and sex discrimination claims that requires their dismissal.  DeSoto states in her Response – not her Amended Complaint – that the actions of Captain Taylor, Director Lynch, Officer Hooper, and

---

[27] In *Carr v. United Parcel Serv.*, 955 S.W. 2d 832, 837 (Tenn. 1997), the Tennessee Supreme Court construed the THRA's accomplice liability provision, which contains no internal statutory definition.  After setting forth its construction of statutory language in light of the common law, the court in a separate section addressed the application of accomplice liability in the context of a hostile work environment claim premised on co-worker harassment (*i.e.*, harassment by a non-supervisory employee).  *Id* at 836-37.  The court held as follows:

> Individual accomplice liability under a hostile work environment theory requires conduct that is distinct from the harassment.  To impose individual accomplice liability on a non-supervisory employee, a court must find: (1) that a hostile work environment existed; (2) that the employee acted affirmatively to aid, abet, incite, compel, or command an employer not to take remedial action to the hostile work environment; and (3) that the employer engaged in employment-related discrimination by failing to take adequate remedial action.  Although a non-supervisor will rarely possess the ability to prevent an employer from taking remedial action, the non-supervisor should be liable for conduct which encourages or prevents an employer from taking remedial action.

*Id.* at 837.  As the court understands *Carr*, this additional basis for liability only applies to hostile work environment claims premised on co-worker harassment.

Mr. Duke were taken outside the scope of their employment. This statement is fundamentally at odds with the gravamen of DeSoto's constitutional claims. DeSoto alleges that each defendant acted "under color of state law" for purposes of § 1983 liability (both directly and for conspiracy), for which she relies on the same allegations with respect to her individual THRA claims. Those defendants could not have engaged in conduct under color of their office while simultaneously acting outside the scope of their employment.

Furthermore, the Amended Complaint contains insufficient allegations relative to particular defendants. The Amended Complaint does not allege that Duke knew that Metro Nashville or its agents' conduct constituted a "breach of duty" or that Duke gave "substantial assistance or encouragement" to them. Furthermore, DeSoto does not allege that Duke was acting outside the course of his employment in attempting to access the BlackBerry. Finally, DeSoto does not allege what possible motivation Duke would have had to destroy data on the phone or, for that matter, that Duke even intended to destroy the data. The court finds that DeSoto has not pleaded these allegations with sufficient specificity to support a THRA claim for "aiding and abetting." The court will therefore dismiss the THRA aiding and abetting claim against Duke without prejudice.[28]

---

[28] The court therefore need not address whether Duke is otherwise entitled to qualified immunity under state law. Also, although it seems likely that Duke's activity took place within the scope of his employment, DeSoto's Amended Complaint allegations are simply too obscure (perhaps by design) for the court to rule with confidence on that issue. In the unlikely event that DeSoto can reasonably claim that Duke was acting outside the scope of his employment: DeSoto's amended pleading should articulate with clarity and sufficient context what specific actions it alleges that Duke took, how those actions constitute aiding and abetting (rather than discriminatory or retaliation practices in of themselves), and why Duke's actions were not taken within the scope of his general duties as a Metro Nashville computer technician.

As to Officer Hooper, the claim suffers from some of the same defects. DeSoto does not argue that Officer Hooper cleaned out her office outside the scope of his employment (*i.e.*, not in his capacity as a Metro Nashville employee) or that Hooper knew or should have known that Metro Nashville or its agents' conduct constituted a "breach of duty." Furthermore, the Amended Complaint fails to identify how Officer Hooper's conduct was retaliatory or how it otherwise aided and abetted a discriminatory practice. Absent these elements, the claim is not viable. Unlike the claims against Duke, the court finds no potential ambiguities in the Amended Complaint as to whether Officer Hooper was acting within the scope of employment, particularly where DeSoto has alleged that Officer Hooper acted under color of law for purposes of her multiple § 1983 claims against him. The court will therefore dismiss the THRA claims against Officer Hooper with prejudice.

As to Captain Taylor, the Amended Complaint appears to allege that Captain Taylor himself discriminated and retaliated against DeSoto. Also, the Amended Complaint does not give rise to a reasonable inference that Captain Taylor was acting outside the scope of his employment with respect to any of the actions alleged in the Amended Complaint. However, given Captain Taylor's central role in DeSoto's de-commissioning and the alleged acts of retaliation, the court will permit DeSoto to re-plead her individual THRA claims against Captain Taylor. Again, the court is somewhat at a loss to understand how Captain Taylor's actions could have constituted both actions "under color of law" and actions outside the scope of his employment at the same time. In re-pleading her claims, DeSoto will need to plead facts showing why the court should not find that (a) DeSoto is simply asserting claims against Taylor for his own allegedly discriminatory or retaliatory actions, and (b) Captain Taylor was acting within the scope of his employment in engaging in each of those actions.

Finally, Director Lynch argues that he cannot be held liable under the THRA because (1) he was acting within the course and scope of his employment under the facts alleged in the Amended Complaint, or (2) DeSoto has failed to allege a retaliatory action that meets the *Burlington* standard. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). As with the claims against Captain Taylor, the court is skeptical that the allegations could support an inference that Lynch acted outside the scope of his employment in any respect. Nevertheless, the court will permit DeSoto to re-plead her THRA claim against Director Lynch, if she believes that she can in good faith assert that Director Lynch's actions were taken outside of his role as the Director of Parks and Recreation.

**L. Federal Anti-Hacking Claims**

1. CFAA Access Claims

DeSoto asserts claims under the CFAA against Duke, Captain Taylor, and Director Lynch. The CFAA is a criminal statute that prohibits unauthorized access to a "computer" (or in some cases a "personal computer") for certain purposes, including obtaining certain enumerated types of information, accessing government nonpublic computers, perpetrating fraud, or causing damage.[29] *See* 18 U.S.C. § 1030(a). In most pertinent part, the statute imposes criminal penalties on anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage," *id.* § 1030(a)(5)(B), and anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." *Id.* § 1030(a)(5)(C). The Sixth Circuit refers to these two

---

[29] The statute also criminalizes certain types of transmissions and trafficking, such as the unauthorized transmission of a program that intentionally causes damage to a protected computer or trafficking in protected passwords used to gain unauthorized access to computers. *See* 18 U.S.C. § 1030(a)(6)-(7). Those provisions are not at issue here.

categories of claims as "access" claims. *See Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011).

In addition to criminal penalties, the CFAA, at § 1030(g), provides a private cause of action for CFAA violations, including access claims, that caused or were intended to cause five specific types of damages or losses set forth in § 1030(c)(4)(A)(i). Of those five categories, only one is potentially relevant here: "Loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]" 18 U.S.C. § 1030(c)(A)(i)(I).

Putting all of the relevant interlocking provisions together, DeSoto must show that (1) a particular defendant (i) intentionally accessed (ii) a protected computer (iii) without authorization, (iv) causing damage or loss to it, and that (2) the defendant's actions caused $5,000 of "loss" within a one-year period as forth in § 1030(c)(A)(i)(I). Several of these elements are defined within the statute. The term "protected computer" means a computer "which is used in a manner that affects interstate or foreign commerce or communication of the United States." *Id.* § 1030(e)(2)(B).[30] The term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or

---

[30] A "computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device." *Id.* § 1030(e)(1). This is an exceptionally broad definition that would seem to encompass a BlackBerry. *See United States v. Kramer*, 631 F.3d 900, 901 (8th Cir. 2011). For purposes of this opinion, the court will assume that a BlackBerry is a computer under the CFAA, a point that the defendants do not appear to dispute.

information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" *Id.* § 1030(e)(11).

      2.  <u>Application</u>

The remaining defendants challenge essentially every element of DeSoto's CFAA claims. They contend that (1) DeSoto has not alleged facts showing that her BlackBerry was a protected computer because she did not plead the interstate commerce element, (2) she has not alleged facts showing that Duke "accessed" the BlackBerry; (3) she cannot show that Duke accessed the BlackBerry "without authorization" because Metro Nashville owns the BlackBerry; and (4) DeSoto has not alleged sufficient "loss" under § 1030(c)(4)(A)(i)(I).

With respect to the interstate commerce element, the only question is whether DeSoto has alleged facts giving rise to a plausible inference that the BlackBerry was "used in a manner that affects interstate . . . commerce," a broad definition that reaches as far as Congress's commerce clause power. *See Freedom Banc Mortg. Servs, Inc. v. O'Hara*, 2012 WL 3862209, at *5 (S.D. Ohio Sept. 5, 2012) (citing *Russell v. United States*, 471 U.S. 858, 859 (1985)). DeSoto did not plead this element or facts related to it.

As to whether Duke "accessed" the BlackBerry, the Amended Complaint is confounding, perhaps by design. DeSoto alleges that the BlackBerry "was supposed to have been preserved by Metro for imaging by Sgt. DeSoto's expert," but that, according to Captain Taylor's testimony, Duke "*attempted to access* the phone up to 9 times." (Am. Compl. ¶ 20 (emphasis added).) The Amended Complaint contains what purports to be a lengthy deposition excerpt from Captain Taylor's deposition in the CSC Appeal. In the excerpt, Taylor repeatedly emphasizes that Duke "attempted" to access the BlackBerry. For instance, he explains that the BlackBerry remained in a locked safe until he learned that "Duke from ITS was going to *attempt to retrieve* text, e-mails,

50

different things from it." (*Id.* (emphasis added).) After it was removed from the safe, "he [Duke] went through the process of *attempting to access* it." (*Id.* (emphasis added).) Taylor explains that Duke "unsuccessfully *tried* nine times to access it" using different pincodes and by trying to reset some type of baseline password. (*Id.* (emphasis added).) At times in the cited testimony, Taylor also describes the process of entering a password as "access" (rather than as "attempted access"), including characterizing the issue as "how many times the phone had been accessed," referencing "the way he [Duke] accessed that [the BlackBerry]", and stating that "if you access [it] one more time it is going to be deleted[.]" He also states that Duke "had the actual password changed twice in an attempt to put in a baseline password that he could access, and that didn't work."

It is unclear from DeSoto's Amended Complaint whether DeSoto is even alleging that Duke actually "accessed" the BlackBerry within the meaning of the CFAA. DeSoto's Amended Complaint does not allege which actions by Duke she believes constituted "access" to the BlackBerry, nor are any self-evident to court. The gravamen of the cited testimony from Taylor seems to be that Duke *attempted* to access the BlackBerry (for some unstated purpose) but was unsuccessful. Indeed, that is precisely the manner in which DeSoto herself characterizes Taylor's testimony within her Amended Complaint in the text immediately preceding the testimonial excerpt. (*See* Am. Compl. ¶ 20 (stating that Taylor "testified under oath that Mr. Duke with ITS *attempted to access* Sgt. Desoto's phone up to 9 times and then lied about it").) In her Response, perhaps realizing that the alleged facts establish that the CFAA does not apply here, she pivots in an attempt to take a position contrary to the allegations in her own Amended Complaint. The Amended Complaint governs.

At any rate, the defendants have cited legal authority for the proposition that "access" requires proceeding past a login screen and that a defendant has not accessed a device without gaining admission to its contents. *See, e.g.*, *WEC Carolina Energy Solutions, LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (defining "access" to mean "[t]o obtain, acquire, or [t]o gain admission to"); *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*, 121 F. Supp. 2d 1255, 1272-73 (N.D. Iowa 2000) ("As a noun, 'access' . . . means to exercise the freedom or ability to make use of something."); *see also State v. Allen*, 917 F.2d 848 (1996) (under Kansas computer crime statute, no "access" to program until user proceeds past banners and log-in screen). DeSoto does not provide any competing legal authority for the proposition that failing to proceed past a login screen constitutes "access," and DeSoto concedes in her response that "Mr. Duke may not have successfully 'accessed' Sgt. DeSoto's BlackBerry and obtained information from the same[.]" (Response at p. 46.) However, Sgt. DeSoto appears to allege that, because Captain Taylor indicated that Duke may have twice changed the BlackBerry's password, Duke "accessed" the device under the statute. Taken in context, the cited deposition testimony only gives rise to the reasonable inference that Duke changed the password as part of his *attempt* to gain access to the BlackBerry's data, which was unsuccessful. DeSoto provides no authority for the proposition that altering a password as part of an attempt to gain access to a device constitutes "access" under the CFAA.

As to the authorization to access the BlackBerry, DeSoto does not allege that Metro Nashville had no proprietary interest in the BlackBerry; in fact, in her Response, DeSoto does not dispute that Metro Nashville in fact owns the BlackBerry. To show that Duke must have accessed the BlackBerry "without authorization," DeSoto attempts to introduce numerous materials outside the pleadings indicating that Duke attempted to access the BlackBerry despite

52

the presence of a litigation hold agreement and an order in the CSC Appeal. Even in light of these materials, DeSoto's Response does not directly address how Metro Nashville could attempt to access *its own* BlackBerry "without authorization," let alone provide authority for this odd position. This is a fatal flaw in DeSoto CFAA claim. As Duke points out, under Sixth Circuit authority, "a person who uses a computer 'without authorization' has no rights, limited otherwise, to access the computer in question." *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 304 (6th Cir. 2011); *see also Martin Corp. v. Speed*, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006) (observing that individuals "without authorization" have "no permission to access whatsoever"); *see also WEC Carolina*, 687 F.3d at 204 ("[A]n employee is authorized to access a computer *when his employer* approves or sanctions his admission to that computer.") (emphasis added). Here, Metro Nashville owns the BlackBerry; thus, it has at least some right to the information contained on the BlackBerry and the CFAA claims fail.

To the extent that Duke and Metro Nashville should not have attempted to access the BlackBerry in light of the administrative order and the agreement among the parties in the CSC Appeal – concerns that do not affect Metro Nashville's ultimate proprietary interest in the BlackBerry – that is a matter for the ALJ in the CSC Appeal to handle, at least at this stage. While Duke's actions may have been incompetent, ill-advised, or perhaps sufficiently reprehensible to support sanctions by the CSC, Duke's complaints about data destruction are not cognizable as claims under the CFAA. The CFAA claims will therefore be dismissed with prejudice.[31]

--------

[31] Because the CFAA claims are subject to dismissal with prejudice on the above grounds, the court need not address whether DeSoto's allegations plausibly establish that she suffered the requisite sufficient losses under § 1030(c)(4)(A)(i)(I). To the extent that DeSoto has relied on

## M. **TPCCA Claims**

Like the CFAA, the TPCCA is a criminal statute that also authorizes a private cause of action. Section 602 criminalizes certain types of data hacking, broadly including (1) accessing or attempting to access a computer for certain criminal purposes (*see* Tenn. Code Ann. § 39-14-602(a)), and (2) "intentionally and without" authorization engaging in one of five enumerated categories of conduct (*id.* § 602(b)). The parties appear to agree that only one category of proscribed conduct within § 602(b) is relevant here. Specifically, § 602(b)(2) imposes criminal penalties on anyone who, "intentionally and without authorization, directly or indirectly, . . . [a]lters, damages, destroys, or attempts to damage or destroy, or causes the disruption to the proper operation of any computer, or who performs an act which is responsible for the which responsible for the disruption of any computer . . . or data which resides or exists internal or external to a computer . . . ." In the definitions section, the TPCCA defines "authorization" as "any and all forms of consent, including both implicit and explicit consent." *Id.* § 601(2).

Under TPCCA § 604, "[a]ny person *whose property* or person is injured by reason of a violation of any provision of this part may file a civil action and recover for any damages sustained and the costs of the civil action." *Id.* § 604(a) (emphasis added). Neither DeSoto's Amended Complaint nor his Response clarifies the defendant(s) against whom she asserts a claim under § 604(a). The court will assume that DeSoto is proceeding only against Captain Taylor, Director Lynch, and Mr. Duke with respect to this claim.

The civil action provision of § 604 only provides a civil action for injury to the "property" of a "person." Here, DeSoto does not dispute that the BlackBerry in question is the

---

materials outside the Amended Complaint to rebut the defendants' argument, the court would not have considered those additional materials.

54

property of Metro Nashville and that it was provided to her for official use only.  She provides

no authority for the proposition that an employee retains a property interest in an employer-

owned and employer-furnished BlackBerry.  Thus, there is no indication that the BlackBerry was

DeSoto's "property" and she cannot maintain an action against its actual owner for accessing it.

The court will therefore dismiss DeSoto's TPCCA claim with prejudice on this basis alone.

Furthermore, as with the CFAA claims, DeSoto does not explain how Metro Nashville could

attempt to access its own BlackBerry "without authorization," which provides another

independent grounds for dismissal.  Finally, she does not allege that any defendant actually

intended to destroy the information on the device – as required to maintain a claim under §

602(b) – which provides a third independent basis for dismissal of the TPPCA claims.

### N.  **The Metro Code Ordinance**

Metro Code § 11.20.130 states that "[i]t is unlawful for the metropolitan government to

fail or refuse to hire or promote, or to discharge any individual, because of such individual's . . .

sexual orientation."  The Metro Code contains an administrative enforcement mechanism in

§ 11.20.110.  Metro Nashville contends that § 11.20.130 does not create a private right of action

against Metro Nashville for sexual orientation discrimination.  The individual defendants also

argue that, regardless of whether the ordinance purports to create a private right of action, that

cause of action would only apply to Metro Nashville itself, not to individual defendants.[32]

---

[32] After the parties completed their briefing in this case, the Tennessee Court of Appeals issued
an opinion in *Howe v. Haslam*, 2014 WL 5698877 (Tenn. Ct. App. Nov. 4, 2014).  In that case,
several Nashville-based individuals, organizations, and public officials challenged the
constitutionality of Tennessee legislation that prohibited municipalities (including Metro
Nashville) from applying anti-discrimination laws to "any person" other than the municipality
itself.  *Id.* at *9-*10 (quoting Tenn. Code Ann. § 7-51-1802).   The *Howe* court upheld the
dismissal of the lawsuit for lack of standing, but, in its opinion, it observed that § 7-51-1802(d)

With regard to the latter argument, DeSoto does not identify any portion of the statute that she claims supports a claim for *individual* liability. Indeed, the code section states that it is unlawful for the "metropolitan government" itself (*i.e.*, Metro Nashville) to discriminate on the basis of sexual orientation. In the absence of a cogent explanation by DeSoto that this plain language could reasonably be interpreted as applying to individuals as well, the court finds no basis for imposing individual liability under any circumstances. The court will therefore dismiss the individual sexual orientation discrimination claims with prejudice.

With respect to Metro Nashville, the issue is more complicated. Metro Nashville argues that the court should either (1) dismiss the claim with prejudice, (2) certify the issue to the Tennessee Supreme Court (if this court is not prepared to dismiss it), or (3) decline to exercise supplemental jurisdiction over the claim. Given that the court will permit DeSoto to file an amended pleading against Metro Nashville and certain other defendants (who will likely challenge the sufficiency of at least some of the re-pleaded claims), the court finds that it would be premature to make a final ruling concerning the appropriate disposition of the sexual orientation discrimination claim.[33]

---

expressly "does not prohibit local governments from adopting anti-discrimination policies broader than those provided by State law with respect to government employees." *Id.* at *15.

[33] There are a few issues that the parties should be prepared to address with respect to this claim. Can a municipality create a private cause of action that a court must enforce against the municipality? Has a Tennessee plaintiff ever maintained a discrimination claim in state or federal court based on the Metro Code's anti-discrimination provisions? Should the court place any weight on the city council's discussion about the ordinance and, if so (as to a point that the defendants conspicuously failed to address in their reply briefs), is there any reasonable way to construe the city council's discussion as *not* signaling an intent to create an enforceable private cause of action against Metro Nashville? Finally, DeSoto should be prepared to take a position as to whether the issue is appropriate for certification to the Tennessee Supreme Court or, in the

## IV. **Supplemental Jurisdiction**

Director Lynch in particular argues that the court should decline to exercise supplemental jurisdiction over Desoto's non-federal claims. As it stands, only two types of non-federal claims may be included in DeSoto's forthcoming amended pleading: (1) a sexual orientation discrimination claim against Metro Nashville under the Metro Code, the disposition of which the court is deferring for the reasons stated in the previous section, and (2) certain THRA claims against Director Lynch, Captain Taylor, and Mr. Duke, which the plaintiff will be permitted to re-plead if she can assert the requisite elements in good faith. Given that DeSoto will be filing an amended pleading and that it is not clear which state law claims will be asserted therein, the issue is moot until DeSoto files her amended pleading.

## **CONCLUSION**

The court finds as follows:

- DeSoto's claims against the Board of Parks and Recreation will be dismissed with prejudice.

- DeSoto's individual claims against defendants Irvin, Moore, and Hooper for violations of her right to privacy (substantive due process) and her rights under the First Amendment will be dismissed without prejudice. Her remaining claims against Irvin, Moore, and Hooper are dismissed with prejudice.

- DeSoto's claims against Duke will be dismissed with prejudice, except for the following individual claims, which will be dismissed without prejudice: (1) as they relate to constitutional claims not otherwise dismissed with prejudice, her § 1983 conspiracy claim; and (2) the individual THRA claims as they relate to alleged discrimination or retaliation on the basis of race or sex.

- Desoto's claims against Director Lynch will be dismissed with prejudice, except for the following claims, which will be dismissed without prejudice: (1) the § 1983 First Amendment and right to privacy claims; (2) the § 1983 Equal

---

alternative, why the court should not refuse to exercise supplemental jurisdiction over the claim because it presents a novel or complex issue of Tennessee law.

Protection claims as they relate to race and sex discrimination; (3) the individual
THRA claims as they relate to alleged discrimination or retaliation on the basis of
race and sex; and (4) as they relate to constitutional claims not otherwise
dismissed with prejudice, her § 1983 conspiracy claims.

- Desoto's claims against Metro Nashville will be dismissed with prejudice, except
  for (1) her Title VII claim, which Metro Nashville did not challenge, (2) her
  sexual orientation discrimination claim under the Metro Code, (3) as they relate to
  constitutional claims not otherwise dismissed with prejudice, her § 1983
  supervisory liability claims against Metro Nashville.

- DeSoto's claims against Captain Taylor will be dismissed with prejudice, except
  for (1) the § 1983 First Amendment and right to privacy claims, which will be
  dismissed without prejudice; (2) the § 1983 Equal Protection claims as they relate
  to race and sex discrimination, which will be dismissed without prejudice; (3) the
  individual THRA claims as they relate to alleged discrimination or retaliation on
  the basis of race and sex, which will be dismissed without prejudice; (4) the
  Fourth Amendment and false imprisonment claims, which Taylor did not
  challenge; and (5) as they relate to constitutional claims not otherwise dismissed
  with prejudice, her § 1983 conspiracy claims.

The court will permit DeSoto to file an Amended Complaint that substantially clarifies
her claims against the remaining defendants as to the claims that have not been dismissed with
prejudice. In response to the Amended Complaint, the individual defendants may assert
qualified immunity challenges to particular claims, the merits of which the court will consider at
that time. All discovery will be stayed until further order of the court.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge